**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

MELISSA WILLIAMS, HELEN COLBY, and STEVEN JEFFREY HOWITT on behalf of themselves and others similarly situated,

        Plaintiffs,

v.

WHITESTONE HOME FURNISHINGS, LLC, d/b/a SAATVA

        Defendant.

Case No.    1:25-cv-01527-LDH-RMC

**ORAL ARGUMENT REQUESTED**

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S**
**MOTION TO DISMISS CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**
**FOR LACK OF STANDING PURSUANT TO FED. R. CIV. P. 12(b)(1) AND**
**FAILURE TO STATE A CLAIM PURSUANT TO FED. R. CIV. P 12(b)(6)**

---

DATE SERVED:        February 5, 2026

AMUNDSEN DAVIS, LLC
150 N. Michigan Avenue, Suite 3300
Chicago, Illinois 60601
(312) 894-3200
(312) 894-3210 (fax)

*Attorneys for Defendant,*
*Whitestone Home Furnishings, LLC*
*d/b/a Saatva*

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS ................................................................................................ 2

     **The Representations** ............................................................................................ 3

     **The Materials** ....................................................................................................... 4

          1.     Polyester ......................................................................................... 4

          2.     Viscoelastic Polyurethane ............................................................. 5

          3.     Rayon ............................................................................................. 5

LEGAL STANDARD ....................................................................................................... 6

ARGUMENT ..................................................................................................................... 7

   I.    PLAINTIFFS LACK STANDING BECAUSE
       THEY HAVE NOT PLAUSIBLY ALLEGED
       ANY ECONOMIC INJURY OR RISK OF FUTURE HARM ................................. 7

   II.   PLAINTIFFS HAVE NOT STATED
       A VALID CAUSE OF ACTION ............................................................................... 9

      A.   Plaintiffs' Consumer Fraud Claims (Counts I-V)
          Should Be Dismissed Because the "Representations"
          Would Not Mislead a Reasonable Consumer ........................................... 10

          i. The Representations are appropriately contextualized
            on Saatva's website ....................................................................... 11

          ii. No reasonable consumer would interpret the
            Representations in the absolutist manner that Plaintiffs contend ........... 15

          iii. The Representations, standing alone, would
            not have been material to a reasonable consumer ...................................... 18

B.    Plaintiffs' Consumer Fraud Claims Fail for Additional Reasons as Well.................. 19

   i. Plaintiff Williams has no claim under the
   New Jersey Consumer Fraud Act N.J. Stat. § 56:8-1 *et seq.*(Count I). ...................... 19

   ii. Plaintiff Colby has no claim under the
   Florida Deceptive and Unfair Trade Practices Act ("FDUPTA"),
   Fla. Stat. §§ 501.201-213 (Count II). ......................................................................... 21

   iii. Plaintiff Howitt has no claim under either section
   of the New York General Business Law, (Counts III and IV). ............................... 22

C.    Plaintiffs Have No Breach of Warranty Claim Under
Either the Magnusson-Moss Warranty Act (Count VIII)
or Common Law (Count VI) Having Failed to Identify
the Warranties at Issue, and Furthermore, Not Alleging a Breach............................ 23

D.    Plaintiffs Cannot Bring an Unjust Enrichment Claim
(Count VII) Because the Parties' Relationship Is Governed
by Contract Law Precluding Such a Claim as a Matter of Law. ................................ 24

**CONCLUSION** ........................................................................................................................ **25**

## TABLE OF AUTHORITIES

**Cases**

*Absorbezz, L.L.C. v. Hierseman*,
No. 19-61442-Civ, 2020 U.S. Dist. LEXIS 215903 (S.D. Fla. Nov. 16, 2020) ........................... 21

*Am. Federated Title Corp. v. GFI Mgmt. Servs.*, Inc.,
39 F. Supp. 3d 516 (S.D.N.Y. 2014) ....................................................................................... 7

*Anderson v. Bungee Int'l Mfg. Corp.*,
44 F. Supp. 2d 534 (S.D.N.Y. 1999) ..................................................................................... 23

*Annabi v. N.Y. Univ.*, No. 22-cv-3795 (LJL),
2024 U.S. Dist. LEXIS 169857 (S.D.N.Y. Sep. 20, 2024) ..................................................... 15

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ............................................................................................................... 6

*Bank of New York Mellon Trust Co. v. Morgan Stanley Mortg. Capital, Inc.*,
*Mortg. Capital, Inc.*,
11 Civ. 0505 (CM)(FM), 2011 U.S. Dist LEXIS 69168 (S.D.N.Y. Jun. 27, 2011) ...................... 7

*Barreto v. Westbrae Nat., Inc.*,
518 F. Supp. 3d 795 (S.D.N.Y. 2021) .................................................................................... 23

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ............................................................................................................... 6

*Bell v. Publix Super Mkts., Inc.*,
982 F.3d 468 (7th Cir. 2020) ................................................................................................ 18

*Bowring v. Sapporo U.S.A., Inc.*,
234 F. Supp. 3d 386 (E.D.N.Y. 2017) .................................................................................... 15

*Bubak v. Golo, LLC*, No. 1:21-cv-00492-DAD-EPG,
2022 U.S. Dist. LEXIS 248250 (E.D. Cal. Aug. 28, 2022) ...................................................... 4

*Bynum v. Family Dollar Stores, Inc.*,
592 F. Supp. 3d 304 (S.D.N.Y. 2022) .................................................................................... 23

*Campbell v. Heartland Payment Sys., Inc*., Civil Action No. 16-cv-01104 (PGS),
2016 U.S. Dist. LEXIS 203476 (D.N.J. Sep. 26, 2016) ................................................................ 24

*Campbell v. Whole Foods Mkt. Grp., Inc.*,
516 F. Supp. 3d 370 (S.D.N.Y. 2021)........................................................................................... 24

*Chen v. Dunkin' Brands, Inc.*, Case No. 17-CV-3808(CBA)(RER),
2018 U.S. Dist. LEXIS 234591, *20 (E.D.N.Y. Sept. 17, 2018) ................................................... 2

*Carriuolo v. Gen. Motors Co.*,
823 F.3d 977 (11th Cir. 2016) ..................................................................................................... 11

*Clapper v. Amnesty Intern. USA*,
568 U.S. 398 (2013).................................................................................................................... 8, 9

*Davis v. Lost Int'l LLC*, No. CV 12-8002 GAF (MANx),
2013 U.S. Dist. LEXIS 199179  (C.D. Cal. Apr. 8, 2013) .............................................................. 4

*Diaz v. Paragon Motors of Woodside, Inc.*,
424 F. Supp. 2d 519 (E.D.N.Y. Mar. 29, 2006)........................................................................... 23

*DiLeo v. Ernst & Young*,
901 F.2d 624 (7th Cir. 1990) ......................................................................................................... 7

*Donoff v. Delta Air Lines, Inc*, No. 18-81258-CV-MIDDLEBROOKS/Bran,
2020 U.S. Dist. LEXIS 41408 (S.D. Fla. Mar. 6, 2020)............................................................... 21

*Dorris v. Danone Waters of Am.*, No. 22 Civ. 8717 (NSR),
2024 U.S. Dist. LEXIS 208035 (S.D.N.Y Nov. 14, 2024)............................................................. 17

*Dugan v. TGI Fridays, Inc*.,
231 N.J. 24, 171 A.3d 620 (2017)................................................................................................ 21

*Eon Labs Mfg. v. Watson Pharm., Inc*.,
164 F. Supp. 2d 350 (S.D.N.Y. 2001)........................................................................................... 22

*ExamWorks, Inc. v. Soltys*, No. 17-CV-0080-LJV-MJR,
2017 U.S. Dist. LEXIS 175307 (W.D.N.Y. Aug. 10, 2017) ......................................................... 24

*Fero v. Excellus Health Plan, Inc.*,
236 F. Supp. 3d 735 (W.D.N.Y. 2017) ...................................................................................... 17

*Fink v. Time Warner Cable*,
714 F.3d 739 (2d Cir. 2013) .......................................................................................... 1, 11, 12

*Fox v. Hyundai Motor Fin./ Hyundai Motor Am.*,
No. 20-CV-60936-RAR, 2020 U.S. Dist. LEXIS 203739 (S.D. Fla. Oct. 29, 2020) ................... 24

*Gallagher v. Lactalis Am. Grp., Inc.*,
No. 22-CV-614 (JLS), 2023 U.S. Dist. LEXIS 173308 (W.D.N.Y. Sep. 21, 2023) ...................... 9

*Gould v. Helen of Troy, Ltd.*,
2017 U.S. Dist. LEXIS 54611 (S.D.N.Y. Mar. 30, 2017) ............................................................ 9

*Gray v. Bayer Corp.*,
No. 08-4716 (JLL),2009 U.S. Dist. LEXIS 48181 (D.N.J. June 8, 2009) ...................................... 6

*Greenberg v. Chrust*,
282 F.Supp.2d 112 (S.D.N.Y 2003) ......................................................................................... 18

*Hamilton Exhibition, LLC v. Imagine Exhibitions, Inc.*,
2019 U.S. Dist. LEXIS 99578 (S.D.N.Y. Jun. 11, 2019) ........................................................... 18

*Harnish v. Widener Univ. Sch. Of Law*,
931 F.Supp.2d 641 (D.N.J. 2013) ............................................................................................. 10

*Harris v. Mondelez Glob. LLC*,No. 19-cv-2249 (ERK) (RER),
2020 U.S. Dist. LEXIS 133715 (E.D.N.Y. July 28, 2020) ......................................................... 15

*Hemy v. Perdue Farms, Inc.*,Civil Action No. 11-888 (FLW)
2011 U.S. Dist. LEXIS 137923 (D.N.J. Nov. 30, 2011) ............................................................. 20

*Herazo v. Whole Foods Mkt., Inc.*, No. 14-61909-CIV-MORE,
2015 U.S. Dist. LEXIS 96811 (S.D. Fla. July 23, 2015) ........................................................... 24

*In re Beech-Nut Nutrition Co. Baby Food Litig.*,
No. 1:21-CV-133, 2025 U.S. Dist LEXIS 49882 (N.D.N.Y. Mar. 19, 2025) ............................... 8

*In re Gerber Probiotic Sales Practices Litig.*,
Civil Action No. 12-835 (JLL), 2014 U.S. Dist. LEXIS 94319 (D.N.J. July 11, 2014)............... 20

*In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Practices & Liab. Litig.*,
903 F.3d 278 (3d Cir. 2018).......................................................................................... 7

*In re Plum Baby Food Litig.*,
637 F.Supp.3d 210 (D.N.J. 2022) ............................................................................. 7, 8

*In re Riddell Concussion Reduction Litig.*,
77 F. Supp. 3d 422 (D.N.J. 2015) ............................................................................. 16

*Kommer v. Bayer Consumer Health*,
710 Fed. App'x 43 (2d Cir. 2018)............................................................................... 8

*Kramer v. Time Warner, Inc.*,
937 F.2d 767 (2d Cir. 1991)....................................................................................... 7

*L–7 Designs, Inc. v. Old Navy, LLC*,
647 F.3d 419 (2d Cir. 2011)....................................................................................... 6

*Liberty Mut. Ins. Co. v. Harvey Gerstman Assocs.*,
No. CV 11-4825 (SJF) (ETB), 2012 U.S. Dist. LEXIS 153073 (E.D.N.Y. Sep. 13, 2012)......... 22

*Manchouck v. Mondeléz*, Case No. C 13-02148 WHA,
2013 U.S. Dist. LEXIS 138877 (N.D. Cal. Sept. 26, 2013) ......................................... 1

*Melendez v. One Brands*, No. 18-CV-06650 (CBA) (SJB),
2020 U.S. Dist. LEXIS 49094 (E.D.N.Y. Mar. 16, 2020)............................................ 25

*Miller v. Hyundai Motor Am.*,
No. 15-cv-4722 (TPG), 2016 U.S. Dist. LEXIS 133668 (S.D.N.Y. Sept. 28, 2016) ..................... 6

*Mills v. Polar Molecular Corp.*,
12 F.3d 1170 (2d Cir. 1993)....................................................................................... 6

*New Jersey Citizen Action v. Schering-Plough Corp.*,
367 N.J. Super. 8, 842 A.2d 174 (N.J. Super. Ct. App. Div. 2003)................................ 19, 20, 21

*Pelkey v. McNeil Consumer Healthcare*,
No. 10-61853-CIV, 2011 U.S. Dist. LEXIS 21372 (S.D. Fla. Feb. 15, 2011) ............................ 21

*Reich v. Mitrani*,
268 A.D.2d 256, 701 N.Y.S.2d 368 (1st Dep't 2000) ................................................... 18

*Rider v. Uphold HQ Inc.*,
657 F. Supp. 3d 491 (S.D.N.Y. 2023)...................................................................... 17

*Roqueta v. Avon Prods.* No. 05-21315-CIV-SEITZ/MCALILEY
2005 U.S. Dist. LEXIS 57643 (S.D. Fla. Aug. 15, 2005)............................................ 16

*Rothman v. Gregor*,
220 F.3d 81 (2d Cir. 2000)............................................................................... 5, 6

*S.Q.K.F.C., Inc. v. Bell Atlantic TriCon Leasing Corp.*,
84 F.3d 629 (2d Cir. 1996)............................................................................ 10, 22

*Smajlaj v. Campbell Soup Co.*,
782 F. Supp. 2d 84 (D.N.J. 2011) ........................................................................ 20

*Solo v. Bed Bath & Beyond*,
Case No. 06-1908 (SRC), 2007 U.S. DIST LEXIS 31088 (D.N.J. Apr. 26, 2007)...................... 19

*Stern v. Satra Corp.*,
539 F.2d 1305 (2d Cir. 1976)............................................................................ 18

*Stires v. Carnival Corp.*,
243 F.Supp.2d 1313 (M.D. Fla. 2002) ...................................................................... 6

*Tyman v. Pfizer, Inc.*, No. 16-CV-06941 (LTS) (BCM),
2017 U.S. Dist. LEXIS 212879 (S.D.N.Y. Dec. 27, 2017) ............................................... 6

*U.S. Bank Nat. Ass'n v. PHL Variable Ins., Co.*,
2013 U.S. Dist. LEXIS 38768 (S.D.N.Y. Mar. 5, 2013) ................................................. 18

*Van Praagh v. Gratton*,
993 F. Supp. 2d 293 (E.D.N.Y. 2014) ...................................................................... 3

*Wurtzburger v. Ky. Fried Chicken,* No. 16-cv-08186 (NSR),
2017 U.S. Dist. LEXIS 205881 (S.D.N.Y. Dec. 13, 2017) ..................................................... 10, 22

*Young v. L'Oreal, Inc.,*¸No. 21-CV-0446 (GHW) (KHP),
2021 U.S. Dist. LEXIS 97195 (S.D.N.Y. May 20, 2021).............................................................. 8

**Statutes**
Fla. Stat. § 501.201 et seq .......................................................................................................... 10

Fla. Stat. § 501.211(2)................................................................................................................ 21

N.J. Stat. Ann. §56:81-1 et seq. ...................................................................................... 10, 19, 20

N.Y. Gen. Bus. Law § 349........................................................................................................ 10, 22

N.Y. Gen. Bus. Law § 350........................................................................................................ 10, 22

**Rules**
Fed. R. Civ. P. 12(b)(1)............................................................................................................. 1, 7

Fed. R. Civ. P. 12(b)(6)................................................................................................................. 1

Fed. R. Civ. P. 9(b) ......................................................................................................... 6, 15, 16

**Constitutional Provisions**
United States Constitution Article III ............................................................................................ 8

NOW COMES Defendant, Whitestone Home Furnishings, LLC d/b/a Saatva ("Saatva" or "Defendant"), by and through its attorneys, Amundsen Davis, LLC, and submits this memorandum in support of its Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint ("Complaint") pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6)

## INTRODUCTION

By general overtures on Saatva's website that its mattresses are "eco-friendly," Plaintiffs claim they were misled into believing their foam mattresses would contain no synthetic materials *at all*. It is not clear what Plaintiffs supposedly believed the foam in their mattresses would be made from instead; but, it is axiomatic that a reasonable consumer understands there is no such thing as a memory foam tree. In a comparable consumer fraud matter, Judge William Alsup described it as "ridiculous to say that consumers would expect snack food 'made with real fruit' to contain only 'actual strawberries or raspberries,' rather than these fruits in a form amenable to being squeezed inside a Newton" cookie. *Manchouck v. Mondeléz*, Case No. C 13-02148 WHA, 2013 U.S. Dist. LEXIS 138877, at *9 (N.D. Cal. Sept. 26, 2013). It is equally ***ridiculous*** to say that consumers would expect a foam mattress to be ***solely*** made from cotton and bamboo.

More generally, a reasonable consumer does not interpret a website to mean something that it does not actually say. Instead, reasonable consumers understand that terms like "eco-friendly," like anything else, should be understood within the appropriate context. Both Second Circuit and Federal Trade Commission guidance explain that context is critical and that a reasonable consumer would interpret representations within that context. *Fink v. Time Warner Cable*, 714 F.3d 739, 742 (2d Cir. 2013); 16 C.F.R. §260.4. So, for example, the U.S. Environmental Protection Agency says that solar panels provide "clean" energy, even while

acknowledging that – like the mattresses at issue – they frequently contain plastic.[1] Or a Toyota Prius (or other hybrid electric vehicle) can be "eco-friendly" even though it uses gasoline, because it uses *less* gasoline than a typical car. And so on.

Plaintiffs' other complaints about terms used on the website are similarly divorced from what a reasonable consumer would actually believe and inconsistent with Second Circuit precedent as to the same. While the question of "reasonableness" is typically a question of fact, courts have repeatedly found that the issue can and should be resolved on a motion to dismiss where a reasonable consumer would not plausibly interpret representations in the manner that an enterprising plaintiff might suggest. *See, e.g., Fink*, 714 F.3d at 741; *Chen v. Dunkin' Brands, Inc.*, Case No. 17-CV-3808(CBA)(RER), 2018 U.S. Dist. LEXIS 234591, *20 (E.D.N.Y. Sept. 17, 2018) (dismissing because "[r]easonable consumer[s] acting reasonably under the circumstances" would not interpret the term "Angus Steak" as the plaintiff did). Here, reviewing the website statements at issue as a reasonable consumer would, and in the context that Plaintiffs tellingly omit, it becomes clear that no reasonable consumer would be misled by Defendant's statements. Plaintiffs' Complaint cannot stand, and it should be dismissed in its entirety.

<strong><u>STATEMENT OF FACTS</u></strong>

Saatva manufactures and sells a variety of high-quality mattresses in stores and online. (Dkt. # 14, ¶ 1). Plaintiffs are three individuals who each purchased a queen-sized mattress from Saatva. Specifically, Plaintiff Williams is a resident of New Jersey, who purchased a queen-sized mattress around August 31, 2024; Plaintiff Colby is a resident of Florida, who purchased a queen-sized mattress around August 5, 2021; and Plaintiff Howitt is a resident of New York and purchased a queen-sized mattress around August 4, 2024. (*Id*. at ¶¶ 16-18).

---

[1] https://www.epa.gov/hw/end-life-solar-panels-regulations-and-management

Plaintiffs do not identify the specific mattresses they purchased. Plaintiffs do, however, provide pictures of two Saatva mattress tags, which presumably correspond with two of the mattresses purchased by Plaintiffs. (*See id.* at ¶ 7). One of the tags indicates that the associated mattress includes polyester fiber, rayon fiber, and viscoelastic polyurethane (i.e. memory foam); the second tag indicates that the associated mattress includes polyurethane foam, rayon fiber, viscoelastic foam, and a cotton polyester pad. (*Id.*).

**The Representations.** Plaintiffs allege that they each purchased their mattress in reliance on various statements on Saatva's website, which they characterize as broad representations that Saatva's products are "nontoxic," "safe," "natural," "eco-friendly" and "chemical-free," (collectively, the "Representations"). (*Id.* at ¶ 2). The actual representations on the website are made in specific contexts, such as the statement that Saatva's "'memory foams' are certified by CertiPUR-US, which means that they are 'low in volatile organic compounds (VOCs) and guaranteed to be free of toxic chemicals'" (*Id.*, at ¶ 31).

Other "Representations" include that Saatva's foams "substitute traditional petroleum-based chemicals with 30% naturally-derived soybean & corn oils" and that Saatva uses "organic cotton, recycled steel coils, eco-friendly memory foam, 100% natural latex, and natural thistle flame retardant." (*Id.*, at ¶ 32). Importantly, while Plaintiffs might say that a 30% reduction in petroleum usage does not make foam "eco-friendly," ***they do not otherwise contend that these specific representations, or others like them, are misleading or false***. (*See id., generally.*)

The Representations, cited by Plaintiffs, generally do not appear on the product page for the mattresses they purchased (whichever unidentified mattresses those were). Instead, the "Representations" are generally found on the "Green Initiatives" page of Saatva's website,

3

https://www.saatva.com/green-initiatives.[2] Plaintiffs contend that the Representations on the Green Initiatives page, which they never allege they visited, led them to believe their specific mattresses would be "organic, chemical free, plastic free, and overall, [] made with safe and sustainable components." (Dkt. # 14, ¶ 19).

**The Materials.** Plaintiffs allege certain "health and environmental concerns associated" with three materials in their mattresses: polyester fiber, viscoelastic polyurethane, and rayon fiber (collectively, the "Materials"). (*Id.*, ¶¶ 7-8). Plaintiffs further allege that, based on these concerns and their interpretation of the Representations, they did not believe their mattresses would contain any of these Materials.

What is abundantly unclear is what Plaintiffs *did* believe the contents of the mattresses would be. In any event, ***Plaintiffs do not cite any statements on the website that Saatva's materials are all "organic" or "plastic free," nor any statements that the foam mattresses lack the typical properties associated with mattress foam.***

Moreover, Plaintiffs' allegations about the "concerns" with the materials are primarily based on *possible* harms from the materials *when they are sourced from problematic suppliers,* which Plaintiffs do not allege is the case here. Specifically:

*1.      Polyester.* Polyester is typically a petroleum-derived, plastic-based synthetic fiber. (Dkt. # 14, ¶¶ 53, 54). Facilities that produce polyester "without treating wastewater have a high probability of causing environmental damage, in addition to shedding microfibers into the

---

[2] The Court should take judicial notice of not only this specific page, but the entirety of Saatva's website. *Van Praagh v. Gratton*, 993 F. Supp. 2d 293, 298 (E.D.N.Y. 2014) ("the Court [should] consider the Defendant's website, as it was incorporated by reference in the Plaintiff's Complaint."); *see also*, *Bubak v. Golo, LLC*, No. 1:21-cv-00492-DAD-EPG, 2022 U.S. Dist. LEXIS 248250, at *30-31 (E.D. Cal. Aug. 28, 2022) ( "the court must consider the website as a whole, not merely the screenshots that plaintiff has attached to her FAC"); *Davis v. Lost Int'l LLC*, No. CV 12-8002 GAF (MANx), 2013 U.S. Dist. LEXIS 199179, at *8-9 (C.D. Cal. Apr. 8, 2013) (taking judicial notice of entire website).

4

oceans." (*Id*. at ¶¶ 55-56). Polyester also "tend[s] to be contaminated with antimony, a metal associated with several health problems." (*Id*. at ¶¶ 34-35). Saatva, however, "substitute[s] traditional petroleum-based chemicals with 30% naturally-derived soybean & corn oils[.]" (*Id*., ¶ 31). Plaintiffs do not allege that Saatva sources its polyester from a facility that fails to treat its wastewater, nor do they allege that the polyester used by Saatva is contaminated with antimony.

2.    ***Viscoelastic Polyurethane.*** Viscoelastic polyurethane, commonly known as memory foam, makes up between 2 and 8 percent of each mattress purchased by Plaintiffs, based on the tags in the Complaint (Dkt. # 14, ¶ 7). Plaintiffs concede polyurethane is durable, meaning it needs to be placed less often than other foams (and therefore results in less waste). (*Id.* at ¶ 64). Plaintiffs nevertheless contend that viscoelastic polyurethane is inherently not nontoxic, safe, natural, eco-friendly, or chemical-free because it is typically petroleum-derived. (*Id.* at ¶ 60).

Plaintiffs make further allegations based on the typical formulation and manufacture of (conventional) polyurethane, such as that 10% of it consists of unspecified "chemicals."[3] (*Id.* at ¶ 60). Plaintiffs also allege that polyurethane foam *can* contain volatile organic compounds, which can cause irritation and other harms. (*Id.* at ¶ 61). However, they do not allege that the viscoelastic polyurethane *used by Saatva* contains volatile organic compounds. (*Id.*).

3.    ***Rayon.*** Finally, rayon makes up between 11 and 33 percent of each mattress purchased by Plaintiffs. (*Id.*, ¶ 7). Plaintiffs claim that rayon is not eco-friendly. (*Id.* at ¶ 67). Plaintiffs concede rayon is naturally-derived, but contend it has been "linked" to deforestation. (*Id*. at ¶ 67). Furthermore, the processing of Rayon involves a toxic solvent that "most viscose factories" emit into the environment. (*Id*. at ¶ 68). Plaintiffs do not allege that the rayon used by

---

[3] Plaintiffs further assert that some unspecified amount of these unspecified chemicals in conventional polyurethane are carcinogenic, but the article they cite and incorporate into the Complaint says no such thing. This article, incorporated by reference into the complaint, may be considered on a motion to dismiss. *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000). *See also* "Legal Standard" section, *infra.*, p. 6.

5

Saatva comes from one of these factories, nor do they allege that these issues with the manufacturing issues affect the actual rayon in the mattresses, as encountered by the consumer.

## **LEGAL STANDARD**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007))." Plausibility…depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L–7 Designs, Inc. v. Old Navy, LLC,* 647 F.3d 419, 430 (2d Cir. 2011).

In addition, because Plaintiffs' claims are all based on alleged misrepresentations, the "gravamen of the complaint sounds in fraud" and their allegations are subject to the heightened pleading standard of Fed. R. Civ. P. 9(b). *Miller v. Hyundai Motor Am.*, No. 15-cv-4722 (TPG), 2016 U.S. Dist. LEXIS 133668, at *39-41 (S.D.N.Y. Sept. 28, 2016). "Where the case as a whole is premised on allegations of this nature, the trial court is not required to sift through allegations of fraud in order to find claims not subject to Rule 9(b). *Tyman v. Pfizer, Inc.*, No. 16-CV-06941 (LTS) (BCM), 2017 U.S. Dist. LEXIS 212879, at *22 (S.D.N.Y. Dec. 27, 2017).[4]

Accordingly, to establish their claims, plaintiffs must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993). In other words, Plaintiffs must identify "the

---

[4] *See also Gray v. Bayer Corp.,* No. 08-4716 (JLL), 2009 U.S. Dist. LEXIS 48181, at *7 (D.N.J. June 8, 2009) (causes of action under the New Jersey Consumer Fraud Act must meet the heightened pleading standard of FRCP 9(b)); *Stires v. Carnival Corp.*, 243 F.Supp.2d 1313, 1322 (M.D. Fla. 2002) ("Most courts construing claims alleging violations of the Federal Deceptive Trade Practices Act or its state counterparts have required the heightened pleading standard requirements of Rule 9(b)").

who, what, when, where, and how: the first paragraph of any newspaper story." *Am. Federated Title Corp. v. GFI Mgmt. Servs.*, Inc., 39 F. Supp. 3d 516, 520 (S.D.N.Y. 2014) (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)).

The Second Circuit has "deemed a complaint to include…any statements or documents incorporated in it by reference[.]" *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000). Thus, "[i]n deciding a motion to dismiss, this Court may consider the full text of documents that are quoted in or attached to the complaint[.]" *Bank of New York Mellon Trust Co. v. Morgan Stanley Mortg. Capital, Inc.*, 11 Civ. 0505 (CM)(FM), 2011 U.S. Dist LEXIS 69168, at *8 (S.D.N.Y. Jun. 27, 2011). The Court "may also consider matters of which judicial notice may be taken under Fed. R. Evid. 201." *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir. 1991).

## ARGUMENT

### I.    PLAINTIFFS LACK STANDING BECAUSE THEY HAVE NOT PLAUSIBLY ALLEGED ANY ECONOMIC INJURY OR RISK OF FUTURE HARM

As a threshold matter, Plaintiffs' claims should be dismissed pursuant to Fed. R. Civ. P 12(b)(1) because Plaintiffs lack standing. The only injury Plaintiffs identify is that they "paid a premium price" or that they purchased their mattresses "at prices higher than they would have paid had the true nature of the products been disclosed." (Dkt # 14, ¶¶ 20, 84, 87, 109, 111, 112, 123, 134.)[5] However, "[a] Plaintiff alleging an economic injury as a result of a purchasing decision must do more than simply characterize that purchasing decision as an economic injury." *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Practices & Liab. Litig.*, 903 F.3d 278, 281 (3d Cir. 2018). "The plaintiff must instead allege facts that would permit a factfinder to determine, without relying on mere conjecture, that the plaintiff failed to receive the economic benefit of her bargain." *Id.* Indeed, "[t]o allege economic harm under the benefit-of-the-bargain

---

[5] This refers to both of the paragraphs labeled 134.

theory, it is required that plaintiffs identify the specific misrepresentation that induced their purchase." *In re Plum Baby Food Litig.*, 637 F.Supp.3d 210, 224 (D.N.J. 2022).

Moreover, "[t]hreadbare allegations that, had a plaintiff known about an alleged deficiency in a product, they would not have paid that price for said product, without more, is insufficient to find an injury-in-fact." *Id.* at 225. Rather, the plaintiff must "specify [one or more] comparable, cheaper products to demonstrate that a premium price was in fact paid." *Id.* at 226. A plaintiff has not established they paid a premium price for a product, and dismissal is proper for lack of standing, if they "failed to identify a cheaper, comparable product to support the notion of a premium price." *In re Beech-Nut Nutrition Co. Baby Food Litig.*, No. 1:21-CV-133, 2025 U.S. Dist LEXIS 49882, at *14 (N.D.N.Y. Mar. 19, 2025). These deficiencies are replete in Plaintiffs' Complaint and warrant dismissal.

In addition, Plaintiffs lack Article III standing to pursue injunctive relief. With claims for injunctive relief based on future injuries, Plaintiffs must have a future injury that is both "imminent" and "certainly impending" to establish standing to pursue injunctive relief under Article III. *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 409 (2013) (citations omitted). Plaintiffs allege neither, saying only that they "wish to be able to purchase the Products when the need for a new mattress arises again." (Dkt. # 14, ¶ 114.) Beyond this harm being neither "imminent" nor "certainly impending," it is insufficient to establish standing because "there is no Article III standing to maintain a suit seeking injunctive relief in a consumer protection/deception case when plaintiffs plead that they will not buy the product in the future because the plaintiffs are now fully aware of the alleged deception." *Young v. L'Oreal, Inc.*¸ No. 21-CV-0446 (GHW) (KHP), 2021 U.S. Dist. LEXIS 97195, at *28 (S.D.N.Y. May 20, 2021) (citing *Kommer v. Bayer Consumer Health*, 710 Fed. App'x 43 (2d Cir. 2018)). The same logic

8

applies here: if Plaintiffs do choose to buy a Saatva mattress again, it will be a knowledgeable choice made through their own volition, not one caused by deception. *See also Clapper*, 568 U.S. at 416 (Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves[.]").

Finally, Plaintiffs lack standing to bring claims under the laws of any state other than New York, New Jersey, or Florida, as they attempt to do in Count V, for the additional reason that they do not reside in any of the other 47 states. Plaintiffs cannot paper over this deficiency by calling their Complaint a class action and asserting allegations on behalf of absent putative class members. *See Gallagher v. Lactalis Am. Grp., Inc.*, No. 22-CV-614 (JLS), 2023 U.S. Dist. LEXIS 173308, at *9 (W.D.N.Y. Sep. 21, 2023) ("because [plaintiff] neither resides in, nor alleges that she purchased [the product] within, Alabama, Georgia, South Carolina, Tennessee, or Utah, she lacks standing to assert claims under the consumer protection statutes of those states."). "In 'the class action context, the 'individual injury requirement is not met by alleging that injury has been suffered by other, unidentified members of the class to which [the plaintiff] belong[s] and which [he] purport[s] to represent.'" *Id.* (citations omitted, brackets in original). Further, "[w]here plaintiffs themselves do not state a claim under their respective state's consumer statutes … they do not have standing to bring claims under other state statutes—even where they are named plaintiffs in a purported class action.") (citation omitted). *Gould v. Helen of Troy, Ltd*., 2017 U.S. Dist. LEXIS 54611, at *14 (S.D.N.Y. Mar. 30, 2017).

## II.    PLAINTIFFS HAVE NOT STATED A VALID CAUSE OF ACTION

Even if Plaintiffs could somehow overcome this standing problem —which they cannot—Plaintiffs' claims must be dismissed because they have not stated any valid cause of action against Saatva. While Plaintiffs assert eight causes of action, each one is based on the same underlying premise: that Plaintiffs supposedly reviewed Saatva's website and came away believing their foam mattresses would be organic and have zero environmental impact. But

Plaintiffs' own allegations confirm that Saatva's website said no such thing. Instead, Plaintiffs read certain other statements on Saatva's website and allegedly interpreted them, in the broad manner described, to include various purported implications that the website statements do not actually say. Given that, the relevant question is not what Plaintiffs believed—it is what a reasonable consumer would believe under similar circumstances.

Reasonable consumers purchasing a foam mattress understand that memory foam does not grow on trees, even if they may need to use their computers or smartphones to look up a specific term like "polyurethane." Reasonable consumers also understand that nothing is free of *any* environmental impact, that statements about environmental impact therefore are necessarily relative, and that such statements—like any marketing statements—should be considered in context, not in the abstract. Plaintiffs' positions are inconsistent with Second Circuit case law regarding the nature of a "reasonable" consumer, and their claims should be dismissed.

### A.    Plaintiffs' Consumer Fraud Claims (Counts I-V) Should Be Dismissed Because the "Representations" Would Not Mislead a Reasonable Consumer.

Plaintiffs assert five counts based on consumer fraud statutes: one under New Jersey law (Count I), one under Florida law (Count II), two under New York law (Counts III and IV), and one (Count V) purporting to be a single count under 60 separate statutory provisions from all 50 states. While each state has its own quirks, addressed below, the three states where Plaintiffs reside all require plaintiffs to identify a *materially* misleading statement by the defendant. *See S.Q.K.F.C., Inc. v. Bell Atlantic TriCon Leasing Corp.*, 84 F.3d 629, 636 (2d Cir. 1996) (under New York General Business Law ("GBL") § 349, a plaintiff must show that "(1) defendant has engaged in an act or practice that is deceptive or misleading in a material way, and (2) plaintiff has been injured by reason thereof."); *Wurtzburger v. Ky. Fried Chicken,* No. 16-cv-08186 (NSR), 2017 U.S. Dist. LEXIS 205881, at *5 (S.D.N.Y. Dec. 13, 2017) (same under GBL §

10

350); *Harnish v. Widener Univ. Sch. Of Law*, 931 F.Supp.2d 641, 648 (D.N.J. 2013) ("Under the [New Jersey Consumer Fraud Act], affirmative acts must be ''misleading' and stand outside the norm of reasonable business practice in that it will victimize the average consumer'"); *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 983-84 (11th Cir. 2016) (same under Florida Deceptive and Unfair Trade Practices Act, requiring that the "alleged practice was likely to deceive a consumer acting reasonably in the same circumstances.") (citation omitted).

When considering consumer fraud claims, courts evaluate them based on the standard of a "reasonable consumer acting reasonably under the circumstances." *Fink v. Time Warner Cable*, 714 F.3d 739, 741 (2d Cir. 2013). "It is well settled that a court may determine as a matter of law that an allegedly deceptive advertisement would not have misled a reasonable consumer." *Id.*

Plaintiffs have not and cannot meet that standard because the Representations would not have misled a reasonable consumer acting reasonably under the circumstances. That is true for three distinct reasons. **First**, each of the Representations at issue was properly contextualized on the Saatva website. **Second**, regardless of context, no reasonable consumer would interpret the Representations in the absolutist manner proffered by Plaintiffs; nor would a reasonable consumer read far more into the statements than they actually say, as Plaintiffs propose to do here. **Third**, Plaintiffs have not plausibly alleged that the Representations at issue would be material to a reasonable consumer. Rather, the statements at issue – if taken out of context in the manner that Plaintiffs suggest – are too vague for any reasonable consumer to rely on as having any specific meaning, and thus would not be material to a reasonable consumer's decision.

     i.   The Representations are appropriately contextualized on Saatva's website.

"[I]n determining whether a reasonable consumer would have been misled by a particular advertisement, ***context is crucial***." *Fink*, 714 F.3d at 742 (emphasis added). "A

plaintiff who alleges that he was deceived by an advertisement may not misquote or misleadingly excerpt the language of the advertisement in his pleadings and expect his action to survive a motion to dismiss or, indeed, to escape admonishment." *Id.* Here, review of the Representations Plaintiffs cite as misleading, when that review is done with appropriate context, shows that a reasonable consumer would understand what they meant and not be misled.

For example, in Paragraph 29, Plaintiffs allege that Saatva says its products contain "[e]co-friendly materials that are better for you and the planet" and include a screenshot from the page with that statement. (Dkt. # 14, ¶ 29.) The screenshot in the Complaint appears as follows:



However, that image is stripped of its context—precisely what the *Fink* court said not to do. Here is what that image looked like, in context on the website, shrunk to fit on the page[6]:



---

[6] *See Green Initiatives*, SAATVA, https://pages.saatva.com/green-initiatives (The page has since been updated to say "eco-conscious." The screenshot shows the page as it appeared when Plaintiffs took the screenshot used in the Complaint).

Here is a closer look at the right side of that image:

We only use **eco-friendly foams** that substitute traditional petroleum-based chemicals with **30% naturally-derived soybean & corn oils**

**CertiPUR-US®* certified memory foams** are low in volatile organic compounds (VOCs) and guaranteed to be free of toxic chemicals

Mattress covers made with **organic cotton** grown without chemical insecticides & synthetic fertilizers and treated with **Guardin™**, a botanical antimicrobial treatment that **naturally inhibits the growth of bacteria, mold & mildew**

**Recycled steel coils** are sourced from post-consumer steel and tempered for maximum durability

Base panels on our single-sided mattresses are made with **REPREVE® recycled polyester** which removes four single-use plastic bottles from the waste stream with every Queen mattress made

We never use **fiberglass** or **toxic chemical flame retardants/barriers** in our mattresses, instead we use **natural plant-based thistle pulp and organic wool flame retardants**

**GOTS®* certified organic & OEKO-TEX® Standard 100°** certified bedding free of potentially harmful chemicals

**GOLS° organic-certified natural latex** is harvested sustainably to not cause harm to the rubber trees

Our **GREENGUARD® Gold°** & **eco-INSTITUT®*** certified latex mattresses meet the highest standards for low chemical emissions, helping to reduce indoor pollutants and the risk of daily exposure to potentially harmful substances like VOCs

**How to choose the right sustainable mattress for you** ↗

As this shows, the statement that Saatva uses "eco-friendly materials that are better for you and the planet," on the left side of the page, is not made in a vacuum. Instead, Saatva has provided specific details giving consumers the context they need to know what the statement means.[7]

Similarly, Plaintiffs allege that "[p]olyester is a petroleum-derived, plastic-based synthetic fiber, despite Saatva's promise to 'substitute traditional petroleum-based chemicals.'" (Dkt. # 14, ¶ 53). Yet, as the source Plaintiffs cite actually explains, polyester "is *usually* derived from petroleum" but "[a]lternatives to oil-derived polyester exist." (Dkt # 14, ¶ 53) (emphasis

---

[7] Plaintiffs were given additional context on the actual product page for whichever product they purchased as well – which the Court could have evaluated if Plaintiffs had identified which mattresses they purchased.

added).[8] That is fully consistent with the statement on Saatva's website. Specifically, as Plaintiffs acknowledge, the full sentence provides appropriate context, explaining that Saatva substitutes petroleum-based chemicals "with 30% naturally-derived soybean & corn oils." (*Id.*, ¶ 30). In other words, Saatva's foams substitute traditional polyester for material that uses 30% less petroleum. The statement at issue, with context, is neither misleading nor false.

This context also appropriately qualifies Saatva's broader statement regarding its use of eco-friendly materials. Plaintiffs observe that the Federal Trade Commission "Green Guide" cautions against "unqualified general environmental claims." (*Id.,* ¶ 49). However, Plaintiffs omit the next subsection of the Guide, which provides that "[m]arketers can qualify general environmental benefit claims to prevent deception about the nature of the environmental benefit being asserted." 16 C.F.R. §260.4(c).

Saatva did exactly that. It made specific statements describing precisely what it means by "eco-friendly materials," including: that its foam uses 30% less petroleum than traditional foam; it uses recycled polyester and recycled steel coils; and the other specific materials descriptions seen above. These qualifications are literally *right next to* the broader statement that Saatva uses "eco-friendly materials." In other words, there was no need for Plaintiffs to guess what Saatva meant and no room for a reasonable consumer to interpret the phrase as Plaintiffs allegedly did. The website expressly detailed the precise meaning. As a result, Saatva's Representations are fully consistent with FTC guidance and regulations regarding how to make statements to ensure they are not misleading.

Under both FTC guidance and applicable law, the context provided by Saatva's detailed statements defeats any claim that the Representations were misleading—and these claims should

---

[8] *Fiber Guide: Polyester*, Council of Fashion Designers of Am., https://cfda.com/resources/materials-hub/article/fiber-guide-polyester/, attached hereto as **Exhibit 1**.

be dismissed. *See Annabi v. N.Y. Univ.*, No. 22-cv-3795 (LJL), 2024 U.S. Dist. LEXIS 169857, at \*33-34 (S.D.N.Y. Sep. 20, 2024) ("Plaintiff's GBL claims cannot survive where Defendant has made 'true statements and therefore not misleading statements.'") (collecting cases); *see also Bowring v. Sapporo U.S.A., Inc.*, 234 F. Supp. 3d 386, 391-92 (E.D.N.Y. 2017) (dismissing consumer fraud claims; the truthful statement that a product is "imported," qualified by specific disclosures, meant the "marketing as a whole … would not mislead a reasonable consumer.").

ii. <u>No reasonable consumer would interpret the Representations in the absolutist manner that Plaintiffs contend</u>.

The second reason no reasonable consumer would be misled by the Representations is because no reasonable consumer would interpret those representations in the manner suggested by Plaintiffs, even *without* the context Saatva provided.

Plaintiffs' contentions regarding how a reasonable consumer would interpret the Representations are legal conclusions that need not be taken as true at the motion to dismiss stage. *See e.g.*, *Harris v. Mondelez Glob. LLC*, No. 19-cv-2249 (ERK) (RER), 2020 U.S. Dist. LEXIS 133715, at \*7 (E.D.N.Y. July 28, 2020) (granting motion to dismiss and not accepting allegations that a reasonable consumer would be misled by representations regarding cocoa content). Plaintiffs have not offered any factual allegations to support the conclusion that a reasonable consumer would understand the Representations to mean that their mattresses would contain zero polyester and have no environmental impact of any kind, —nor that a reasonable consumer would understand the specific "Representations" to mean anything other than what they actually say. Plaintiffs' allegations are insufficient even under Rule 8; there are additional deficiencies in light of the applicability of Rule 9(b).

As an initial matter, Plaintiffs have not identified the specific Representations upon which they relied. It cannot be that they relied on *all* of the "Representations" because those

15

statements do not appear on all of Saatva's product pages or apply to all of Saatva's products. For example, Plaintiffs describe allegedly misleading statements about latex, but the mattress tags in their Complaint show the mattresses they purchased contained no latex. (*Compare* Dkt. # 14, ¶ 7, *with id*. at ¶¶ 32, 44). Plaintiffs' failure to identify which mattresses they purchased prevents the Court from being able to ascertain which website statements purportedly give rise to their claims, as well as they context in which those statements were made. Plaintiffs cannot state claims based on representations about products they did not buy. This failure also prevents the Court from being able to see the additional context that Plaintiffs would have been provided on the product page for whichever mattress they purchased.

Absent any detail about the fraudulent acts giving rise to their claims, Plaintiffs' consumer fraud claims should be dismissed. *See e.g., Roqueta v. Avon Prods.*, No. 05-21315-CIV-SEITZ/MCALILEY, 2005 U.S. Dist. LEXIS 57643, at *5-6 (S.D. Fla. Aug. 15, 2005)("Plaintiff's allegation that she purchased the product within the past three years and mere attachment of an undated and unconfirmed advertisement do not sufficiently provide "'the details of the defendant's allegedly fraudulent acts, when they occurred, and who engaged in them.'"(citation omitted);[9] *In re Riddell Concussion Reduction Litig*., 77 F. Supp. 3d 422, 436-37 (D.N.J. 2015)(dismissing New Jersey Consumer Fraud Act claim based on lack of detail regarding the discrete fraudulent omission at issue, "where [plaintiffs] purchased the product at issue, how much they paid, and when they were exposed to Defendants' alleged misrepresentations."). For this reason, Plaintiffs' general allegations that they relied on the Representations is not sufficiently specific to identify the basis for their claims—particularly under Rule 9(b), but even under the Rule 8 standard.

---

[9] Of note, Plaintiffs also do not allege that they visited Saatva's Green Initiatives webpage before purchasing their mattresses, despite many of the "Representations" being taken from that page.

At best, Plaintiffs plead in conclusory fashion that they saw and relied upon (seemingly) *all* the Representations at unspecified times. This is wholly insufficient, even at the pleading stage. They do not identify through which channels, be it certain webpages, at showrooms, printed publications, or other avenue, they read the Representations, let alone what Representations were *actually* viewed and relied upon. (*See* Dkt # 14, ¶¶ 19-20). And, to reiterate, that cannot possibly be what Plaintiffs meant, given that some of the "Representations," like the one about latex, plainly do not apply to the mattresses Plaintiffs purchased.

Quite simply, the Court should disregard such conclusory allegations because there are "no facts regarding whether any [plaintiff] actually relied upon any specific representation, nor… any allegations regarding how or when plaintiffs received, reviewed and processed the numerous statements." *See Rider v. Uphold HQ Inc.*, 657 F. Supp. 3d 491, 504 (S.D.N.Y. 2023); *see also Fero v. Excellus Health Plan, Inc.*, 236 F. Supp. 3d 735, 772 (W.D.N.Y. 2017) (dismissing claim under Rule 9(b) where the plaintiffs failed to allege what they read or saw, "with any particularly," instead only offering the "conclusory assertion" that they relied upon purported the misrepresentations) (collecting cases).

Plaintiffs' failure to meet the pleading standard cannot be cured because, the Representations cannot be repackaged to support their consumer claims. As a matter of law, a reasonable consumer would interpret the phrase "eco-friendly" in relative fashion, not to mean absolutely *no* environmental impact—as that is a practical impossibility. *See e.g.*, *Dorris v. Danone Waters of Am.*, No. 22 Civ. 8717 (NSR), 2024 U.S. Dist. LEXIS 208035, at *19 (S.D.N.Y Nov. 14, 2024) ("a reasonable consumer cannot expect a seller to be 'promising something that is impossible'") (citation omitted). So, for example, solar panels and hybrid cars are generally considered "eco-friendly" even though solar panels require a petroleum-based

17

material (plastic) in production and hybrid vehicles require a petroleum-based material (gasoline) to function. Dismissal is appropriate where, as here, "plaintiffs base [their] deceptive advertising claims on unreasonable or fanciful interpretations of labels or other advertising[.]" *Bell v. Publix Super Mkts., Inc.*, 982 F.3d 468, 477 (7th Cir. 2020).

### iii. The Representations, standing alone, would not have been material to a reasonable consumer.

Dismissal is appropriate for yet another and independent reasons. The Representations, standing alone without the clarification provided by Saatva, would not have been material to a reasonable consumer because these Representations are subject to varying interpretations depending upon vary standards different persons use. This is "classic puffery." "[w]here a representation is subject to varying interpretations depending upon varying standards different persons use." *U.S. Bank Nat. Ass'n v. PHL Variable Ins., Co*, 2013 U.S. Dist. LEXIS 38768, at *18 (S.D.N.Y. Mar. 5, 2013) (citation omitted).

"'Puffing' has been described as making generalized or exaggerated statements such that a reasonable consumer would not interpret the statement as a factual claim upon which he or she could rely." *Hamilton Exhibition, LLC v. Imagine Exhibitions, Inc.*, 2019 U.S. Dist. LEXIS 99578, at *7 (S.D.N.Y. Jun. 11, 2019). Representations constituting puffery "are 'not actionable representations of fact'" under New York law. *Greenberg v. Chrust*, 282 F.Supp.2d 112, 120 (S.D.N.Y 2003) (citing *Reich v. Mitrani*, 268 A.D.2d 256, 701 N.Y.S.2d 368, 369 (1st Dep't 2000)). Here, all five of the "Representations"—stripped of all context by Plaintiffs to make them appear misleading—are "generalized" statements that are not sufficiently specific for a reasonable consumer to have considered them material in the absence of context or explanation.

Similarly, a reasonable consumer would not generally rely on subjective or ambiguous statements, and the Representations, when stripped of context, all into this category. "Value,

18

quality, fitness, success, are usually understood as meaning no more than that the objects conform with the declarant's individual yardstick in such matters." *Stern v. Satra Corp.*, 539 F.2d 1305, 1308 (2d Cir. 1976). "While [the speaker] may make it clear that his reference is to some commonly accepted measure, ordinarily he does not, and his hearer takes it for more at his peril." *Id.* Each of the Representations, as broadly characterized by Plaintiffs, is subjective; there is no agreed-upon threshold at which something becomes "eco-friendly." A reasonable consumer would require more specificity before relying on such a statement as a material basis for a purchase. These Representations, therefore, cannot sit at the cornerstone of any actionable claim.

## B. Plaintiffs' Consumer Fraud Claims Fail for Additional Reasons as Well.

As explained above, all of the Plaintiffs' consumer fraud claims fail for the fundamental reason that they have not identified any false or misleading statements upon which they relied in purchasing a mattress from Saatva. Each count fails for additional, independent reasons as well.

### i. Plaintiff Williams has no claim under the New Jersey Consumer Fraud Act N.J. Stat. § 56:8-1 *et seq.*(Count I).

A plaintiff must allege three elements to state a claim under the New Jersey Consumer Fraud Act ("NJCFA"): "(1) unlawful conduct by the [defendant]; (2) an ascertainable loss on the part of the plaintiff; and (3) a causal relationship between the [defendant's] unlawful conduct and the plaintiff's ascertainable loss." *New Jersey Citizen Action v. Schering-Plough Corp.*, 367 N.J. Super. 8, 12-13, 842 A.2d 174 (N.J. Super. Ct. App. Div. 2003). An "ascertainable loss" is "a cognizable and calculable claim of loss due to the alleged [Consumer Fraud Act] violation." *Solo v. Bed Bath & Beyond*, Case No. 06-1908 (SRC), 2007 U.S. DIST LEXIS 31088, at *7-8 (D.N.J. Apr. 26, 2007). Plaintiff Williams has not sufficiently alleged these elements.

With respect to the first element, Plaintiffs, including Williams, allege that Saatva's advertising was deceptive, which, if true, would potentially make it unlawful conduct under the

19

NJCFA. However, Plaintiffs have not plausibly alleged this element for the reasons stated above—specifically, because they have not plausibly alleged that the Representations would mislead a reasonable consumer. This is a sufficient basis to dismiss Count I.

But there are additional reasons to dismiss Count I. There is no allegation of an ascertainable loss as Plaintiffs' theory of loss is that they "paid a premium price" for their mattresses because of the representations Saatva made about them—*i.e.*, that the price would have been lower but for the allegedly false statements. (Dkt. #14, ¶ 20). New Jersey Courts have expressly rejected this "fraud on the market" theory, which would "virtually eliminate the requirement that there be a connection between the misdeed complained of and the loss suffered." *New Jersey Citizen Action*, 367 N.J. Super. at 16. " Indeed, accepting plaintiffs' argument, the relationship between the alleged misstatement and the ascertainable loss suffered would become so attenuated that it would effectively disappear." *Id*.

As one court explained: "[m]isrepresenting a product in order to get a consumer to purchase it does cause an injury, and what New Jersey Courts require for that loss to be 'ascertainable' is for the consumer to quantify the difference in value between the promised product and the actual product received." *In re Gerber Probiotic Sales Practices Litig.*, Civil Action No. 12-835 (JLL), 2014 U.S. Dist. LEXIS 94319, at *8 (D.N.J. July 11, 2014) (dismissing NJCFA claim where plaintiffs failed to allege the difference in value between the products promised and received) (quoting *Smajlaj v. Campbell Soup Co.*, 782 F. Supp. 2d 84, 99 (D.N.J. 2011)); *Hemy v. Perdue Farms, Inc.*, Civil Action No. 11-888 (FLW), 2011 U.S. Dist. LEXIS 137923, at *41 (D.N.J. Nov. 30, 2011) (dismissing claim based upon representations that chickens were, *inter alia*, "humanely raised"). Nowhere does Plaintiff Williams allege or identify such a loss, and her failure is fatal to her claim under the NJCFA.

20

Finally, even if Plaintiffs had adequately alleged a misrepresentation and a harm, which they do not, they have not plausibly alleged a causal relationship between a misrepresentation and a harm—that is, they have not plausibly alleged that the Representations caused the specific mattresses to have a higher market price than they otherwise would have had. Plaintiffs "cannot establish ascertainable loss and causation" by merely stating that "[Saatva]'s [] prices were higher than they would have been." *See Dugan v. TGI Fridays, Inc.*, 231 N.J. 24, 60, 171 A.3d 620 (2017); *N.J. Citizen Action*, 367 N.J. Super. at 16 (noting that the price inflation theory would eliminate the need for causation or reliance under New Jersey law, which has been already rejected). That is all Plaintiffs allege here, and their conclusory allegation is not sufficient to plead market-based harm.

ii.  Plaintiff Colby has no claim under the Florida Deceptive and Unfair Trade Practices Act ("FDUPTA"), Fla. Stat. §§ 501.201-213 (Count II).

Similar to New Jersey law, the FDUTPA also requires a claim of actual damages: "In any action brought by a person who has suffered a loss as a result of a violation of this part, such person may recover actual damages …" Fla. Stat. § 501.211(2) Such damages are typically "the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties." *Rollins Inc. v. Heller*, 454 So. 2d 580, 585 (Fla. 1st DCA 1984). While Florida has not rejected a premium price theory altogether, there must still be allegations "that show the difference of value in what he was promised … and what he received." *Absorbezz, L.L.C. v. Hierseman*, No. 19-61442-Civ, 2020 U.S. Dist. LEXIS 215903, at *8-9 (S.D. Fla. Nov. 16, 2020) (granting motion to dismiss); *see also Donoff v. Delta Air Lines, Inc*, No. 18-81258-CV-MIDDLEBROOKS/Bran, 2020 U.S. Dist. LEXIS 41408, at *26-27 (S.D. Fla. Mar. 6, 2020).

21

As a helpful contrast to the case at bar, in *Pekley*, the court denied a motion to dismiss where a mouthwash was advertised to provide non-standard benefits, including plaque removal above the gum line. *Pelkey v. McNeil Consumer Healthcare*, No. 10-61853-CIV, 2011 U.S. Dist. LEXIS 21372, at *15-16 (S.D. Fla. Feb. 15, 2011). In denying a motion to dismiss, the court reasoned that since the plaintiff identified a premium price, i.e. that there was $0.70 more charged when comparing to a same-sized antiseptic, this met the pleading requirement. However, here, *Id*. at *16 Plaintiff Colby makes no such claim. There is nothing of substance apart from conclusory allegations that she paid an unspecified "price premium" based on the Representations. (*See* Dkt. # 14, ¶¶ 9, 20.) This failure to plead sufficient facts serves as yet another ground to dismiss her FDUTPA claim.

iii.   Plaintiff Howitt has no claim under either section of the New York General Business Law ("GBL") (Counts III and IV).

To state a claim under New York General Business Law §§ 349 or 350 a plaintiff must show that "(1) defendant has engaged in an act or practice that is deceptive or misleading in a material way, and (2) plaintiff has been injured by reason thereof." *S.Q.K.F.C., Inc.*, 84 F.3d at 636; *Wurtzburger*, 2017 U.S. Dist. LEXIS 205881, at *5.

Plaintiff Howitt has not alleged the first element of this claim because the Representations were not materially misleading, as explained in **Section II(A)**, *supra*. As to the second element, Howitt pleads no injury as a matter of law because there was no deceptive act. *See e.g.*, *Liberty Mut. Ins. Co. v. Harvey Gerstman Assocs.*, No. CV 11-4825 (SJF) (ETB), 2012 U.S. Dist. LEXIS 153073, at *17 (E.D.N.Y. Sep. 13, 2012) ("a claim for injury cannot succeed where no deceptive act has occurred."); *Eon Labs Mfg. v. Watson Pharm., Inc.*, 164 F. Supp. 2d 350, 364 (S.D.N.Y. 2001) (similar). These Counts must be dismissed.

**C.    Plaintiffs Have No Breach of Warranty Claim Under Either the Magnusson-Moss Warranty Act (Count VIII) or Common Law (Count VI) Having Failed to Identify the Warranties at Issue, and Furthermore, Not Alleging a Breach.**

There are multiple reasons why Counts VI and VII should also be dismissed. Initially, a central deficiency is that Plaintiffs do not allege the existence of an express warranty. They have not adequately alleged that any of the "Representations" were a "part of the basis of the bargain" for whichever unspecified mattress they purchased. *Anderson v. Bungee Int'l Mfg. Corp.*, 44 F. Supp. 2d 534, 541 (S.D.N.Y. 1999). Moreover, Plaintiffs' failure to allege a warranty under state law also dooms their MMWA claim, as the MMWA "creates no additional bases for liability[.]" *Diaz v. Paragon Motors of Woodside, Inc.*, 424 F. Supp. 2d 519, 540 (E.D.N.Y. Mar. 29, 2006).

To the extent Plaintiffs would contend that broad phrases like "eco-friendly" created an actionable warranty, the law nowhere supports that contention. "Generalized statements by the defendant … do not support an express warranty claim if they are such that a reasonable consumer would not interpret the statement as a factual claim upon which he or she could rely." *Barreto v. Westbrae Nat., Inc.*, 518 F. Supp. 3d 795, 806 (S.D.N.Y. 2021). That is precisely the case here, where there is no measurable standard for "eco-friendly," and thus, no specific representation upon which the consumer would have relied.

As to the MMWA claim specifically (Count VIII), Plaintiffs have not adequately pled the existence of a written warranty within the meaning of the statute. Here, the Representations are neither written affirmations or promises that the materials are defect free or will meet a specified level of performance—nor are they an undertaking in writing to repair or replace. *Bynum v. Family Dollar Stores, Inc.*, 592 F. Supp. 3d 304, 315-16 (S.D.N.Y. 2022). Instead, the Representations are accurately characterized as product descriptions which make no mention as to whether the mattress is free of defects—which is not pled in any event—or suggest a specified

23

level of performance. *Campbell v. Whole Foods Mkt. Grp., Inc.*, 516 F. Supp. 3d 370, 393 (S.D.N.Y. 2021) (noting product descriptions are not actionable under the MMWA as it does not suggest a product is either defect free or meets a specified level of performance).

> **D.      Plaintiffs Cannot Maintain an Unjust Enrichment Claim (Count VII) Because the Parties' Relationship Is Governed by Contract Law and That Precludes an Unjust Enrichment Claim as a Matter of Law.**

There is no viable unjust enrichment claim here as an express contract governs the parties relationship. Separately, the claim should be dismissed as it is duplicative of the other, similarly deficient claims premised on the Representations.

Unjust enrichment is a "quasi-contract claim" meaning that it cannot exist as a matter of law where there is a contract between the parties. Accordingly, "[c]ourts in this Circuit often dismiss unjust enrichment claims at the pleadings stage where it is clear that there is no dispute as to the existence of a contract between the parties or the fact that the contract applies to the subject matter of the lawsuit." *ExamWorks, Inc. v. Soltys*, No. 17-CV-0080-LJV-MJR, 2017 U.S. Dist. LEXIS 175307, at *13 (W.D.N.Y. Aug. 10, 2017) (collecting cases). The result is the same under New Jersey and Florida law. *See Campbell v. Heartland Payment Sys., Inc.*, Civil Action No. 16-cv-01104 (PGS), 2016 U.S. Dist. LEXIS 203476, at *11 (D.N.J. Sep. 26, 2016) (dismissing unjust enrichment claim as "[a] quasi-contract claim cannot exist when there is an enforceable agreement between parties"); *Fox v. Hyundai Motor Fin./ Hyundai Motor Am.*, No. 20-CV-60936-RAR, 2020 U.S. Dist. LEXIS 203739, at *10 (S.D. Fla. Oct. 29, 2020) (granting motion to dismiss unjust enrichment claim where there was an express contract formed given vehicle sale, which means a "valid and applicable [express contract existed as] to the purchase of her vehicle, [p]laintiff's claim for unjust enrichment is subject to dismissal.").

24

Here, Plaintiffs' unjust enrichment claim cannot exist as a matter of law given the existence of an express contract (their respective purchases) between Saatva and Plaintiffs. *See e.g.*, *Herazo v. Whole Foods Mkt., Inc.*, No. 14-61909-CIV-MORE, 2015 U.S. Dist. LEXIS 96811, at *7-8 (S.D. Fla. July 23, 2015) (reasoning that purchase of homeopathic products forms the basis of an express contract, which precluded an unjust enrichment claim).

Independently, where an unjust enrichment claim is based on the same allegations as other claims, the unjust enrichment claim is duplicative and should be dismissed as such. *Melendez v. One Brands*, No. 18-CV-06650 (CBA) (SJB), 2020 U.S. Dist. LEXIS 49094, at *22-23 (E.D.N.Y. Mar. 16, 2020). That is precisely the case here, as Plaintiffs' unjust enrichment claims are based on the same factual allegations as their others. (Dkt # 14, ¶¶ 137-145).

## **CONCLUSION**

Plaintiffs knew they were purchasing foam mattresses from Saatva, and they concede that Saatva's foam is more environmentally-friendly than traditional foam. Given those facts, it is not clear how Plaintiffs could have been "misled" by Saatva's website. No reasonable consumer would believe that Saatva's website representations somehow implied that its foam mattresses were made of something other than foam. In other words, Plaintiffs got exactly what they thought they were getting and cannot state a claim for consumer fraud or anything else. For all the foregoing reasons, Plaintiffs' Complaint should be dismissed, with prejudice.

Dated: February 5, 2026

By: */s/ Ronald D. Balfour*
  Molly A. Arranz
  Ronald D. Balfour, (NY Bar #5031315)
  marranz@amundsendavislaw.com
  rbalfour@amundsendavislaw.com
  AMUNDSEN DAVIS, LLC
  150 N. Michigan Avenue, Suite 3300
  Chicago, IL 60601
  Tel: (312) 894-3200
  Fax: (312) 894-3210

  Attorneys for Defendant
  WHITESTONE HOME FURNISHINGS,
  LLC

26

# EXHIBIT 1

SEARCH

*F*

MENU

GUIDES

# Fiber Guide: Polyester

October 13, 2021

‹ RESOURCE …                                                    🔗  Share

As part of the CFDA's extensive Sustainability Initiatives Resource Hub launched in January 2019, the CFDA operated an A-Z directory called the Materials Index. The Index was designed as an informational tool, focused on fiber knowledge.

The Materials Index listings migrated in to the CFDA.com Materials Hub and split traditional fibers from new-age innovative fibers/materials.

This series of resource guides are dedicated to ensuring designers have extensive knowledge on traditional fibers.

## POLYESTER

Overview

Polyester is a manufactured synthetic fiber. It is a kind of plastic and is usually derived from petroleum. Alternatives to oil-derived polyester exist, including those made from recycled plastic, agricultural crops, or even waste.

Petroleum is a non-renewable resource and the petrochemicals industry has complicated social and political implications. Polyester generally has significant negative environmental impact during production, use, and disposal.

Polyester has often been considered more sustainable from a consumer care standpoint – polyester garments last a really long time and require less water, energy and heat for washing. But a multitude of recent studies show that polyester sheds small pieces of plastic called microplastics with every wash. These microplastics are filling our water and air, and are being ingested by marine life and animals and even us. While the full extent and impact of these microplastics is not yet clear, it is clear that the problem is huge (microplastics have been found all around the world) and could have detrimental impacts to plant, animal, and human health.

Polyester is the most widely used fiber in the world. It accounts for roughly half of the overall fiber market and around 80% of synthetics fiber, according to the *Textile Exchange Preferred Fiber Materials Report 2017*. In 2016, polyester fiber production is estimated at 52 million metric tons.

Benefits of polyester include durability, versatility, good sunlight resistance, light weight, resistance to wrinkles, resistance to stains, and quick drying time.

As Common Objective points out, polyester's relative cheapness has fuelled the growth of fast fashion.

"Polyester is much (much, much, much!) cheaper than natural fibers and it wears like iron – so you can keep your sofa looking good for 30 years. The real question is, will you actually keep that sofa for 30 years?" – O Ecotextiles

"Unlike in the textile and apparel sector in general (where there are tens of thousands of manufacturers), in instances where textiles are directly connected to oil, ownership coalesces under the power of a few companies, mostly in terms of trademarks and patenting." – Petrocultures: Oil, Politics, Culture

<u>Sustainability Considerations</u>

*Not transparent*

- Good luck sourcing your polyester fiber back to its raw material source. We haven't found any company that does (if you know of any, please let us know). Tracing back beyond the yarn producer is rare. Petroleum is one of the most difficult raw materials to trace back to the source. It's worth noting that the top sources of crude oil are (in order): Saudi Arabia, Russia, the U.S., China, Iraq, Iran, and Canada. Some bio polyesters and recycled polyesters offer a more traceable supply chain.
- "The chains of labour, natural resource extraction, and chemical production involved in the making of textiles and apparel are almost completely invisible in the final product. Entire systems are at work to keep things this way." – Petrocultures: Oil, Politics, Culture
- *Suggestion: Start by asking questions of your suppliers. If everybody asks, the polyester supply chain could become more transparent in time. Choose recycled polyester or polyester derived from renewable resources (like <u>biosynthetics</u>) over virgin polyester.*

*Derived from non-renewable petrochemicals*

- Polyester is a synthetic fiber, but its raw materials still come from nature. Most polyester is made out of petroleum, a natural non-renewable resource. Right now, we're using up petroleum much faster than it can be produced in nature. Some predictions indicate we could reach peak oil (maximum extraction) by 2030.
- Producing plastic-based fibers for textiles uses an estimated 342 million barrels of oil every year, according to *A New Textiles Economy Report 2017.*
- According to an article published in The Guardian in December 2017, fossil fuel companies are among those who have ploughed more than $180 billion since 2010 into new "cracking" facilities that produce raw materials for plastics. The new facilities – being built by corporations like Exxon Mobile Chemical and Shell Chemical – will help fuel a 40% rise in plastic production in the next decade.
- *Suggestions: Choose recycled polyester or polyester derived from renewable resources (like <u>biosynthetics</u>) over virgin polyester.*

*High Energy Use*

- Polyester requires high amounts of energy to produce.
- According to CO, the energy required to produce polyester (125 MJ of energy per kilogram produced) and the greenhouse gas emitted (14.2 kg of $CO_2$ per kilogram produced) make it a high-impact process. In 2015, polyester produced for clothing emitted 282 billion kg of CO2 – nearly three times more than for cotton.
- *Suggestions: Use recycled polyester – 30% less energy is required to make shirts from recycled PET than from virgin polyester.*

*Highly polluting*

- In 2015, polyester produced for clothing emitted 282 billion kg of $CO_2$ – nearly three times more than for cotton, according to CO.
- Water pollution is a big problem. During production, facilities producing polyester without treating wastewater have a high probability of causing environmental damage through the release of heavy metals, and toxic chemicals. The washing and disposal of polyester contributes to a significant amount of water pollution in terms of heavy metals, toxic chemicals, and plastic pollution (in the form of microplastics). Leaks or spills related to the extraction or transport of oil can also have detrimental effects on groundwater, oceans, and other water sources.

*Lower water consumption than other fibers, but highly polluting*

- According to multiple analyses, water consumption in the production of synthetic fibers is lower than for natural fibers
- *Suggestions: In many LCA analyses, polyester does better than many other fibers in terms of low water use. But make sure that your suppliers are not contaminating water and the environment. This can be challenging since very few clothing companies can trace their polyester back far enough to know where all sourcing, transport, and production is happening.*

*Dye process is generally better than for natural fibers.*

- According to the NRDC, polyester requires high temperature dying processes, but the process is shorter and requires less chemical use, making the overall impact lower than for fibers like cotton.
- *Suggestions: Choose more sustainable dyes and finishes.*

*Can be recycled and made out of recycled materials, but often isn't*

- Polyester was one of the first fashion fibers to be recycled into a brand new fiber. Most recycled fibers are produced from bottle-grade, not fiber-grade, polyester. Recycled polyester requires significantly less energy to produce and creates significantly less environmental pollution than virgin polyester.
- According to *A New Textiles Economy Report 2017 (p37)*, "Less than 1% of material used to produce clothing is recycled into new clothing. This includes recycling clothing after use, as well as the recycling of factory offcuts... The majority of this recycling consists of cascading into lower-value applications such as insulation material, wiping cloths, and mattress stuffing. After being used in these applications, currently, the materials are difficult to recapture and therefore are usually discarded."
- *Suggestions: Choose recycled over virgin polyester. Design your products for optimal recycling ability and create systems (for example, a take-back program) to ensure products get recycled.*

*Microplastics*

- It has been estimated that around half a million tons of plastic microfibers are shed into the oceans annually during the washing of plastic-based textiles such as polyester, nylon, or acrylic, according to *A New Textiles Economy Report 2017*
- *Suggestions: Avoid polyester and other synthetic materials.*

*Conflict materials*

- We don't often think of polyester as a conflict material, but its main ingredient, oil, is a leading cause of war. Between one-quarter and one-half of interstate wars since 1973 have been linked to oil. Therefore virgin polyester could be considered a conflict material.

*Potential impacts during customer use care*

- Polyester is resilient, has low absorbency, doesn't wrinkle a lot in use, dries quickly, holds it's form, and is pest-resistant. As a result, it requires relatively low impact care, less water and energy are required than for cleaning other types of fiber.
- Unfortunately, the shedding of microplastics in the wash is a big problem as mentioned previously. Studies are currently underway to understand the problem and impacts on human, animal, and environmental health.
- *Suggestions: Design for less washing, washing in cold water, and air drying. Avoid dry cleaning. Be sure to educate your customers about best consumer care practices.*

*Not Biodegradable*

- According to CO, "As an oil-based plastic, polyester does not biodegrade like natural fibers. Rather it stays in landfill for several decades at least – and potentially for hundreds of years."

## More Sustainable Options

If you are going to use polyester, more sustainable options include:

*Recycled Polyester*

Using recycled Polyester reduces air pollution among other benefits. According to the *Textile Exchange Preferred Fiber Materials Report 2017,* recycled polyester makes up an estimated seven per cent of polyester fiber produced — these fibers are largely used in carpets, blankets, clothing and other textile applications.

Brands that make recycled polyester include:

- Bionic
- Eco Circle™ and ECOPET™ by Teijin



- Econyl
- EcoAlf
- Ecofil by Wellman
- Suprelle® by Advansa
- Far Eastern TOPGREEN®
- Fortrel EcoSpun
- Hyosung Regen™
- Indorama RAMA PET EA 60C
- Libolon RePET™
- Palmetto REPREVE®
- Parley for the Oceans
- Polartec Recycled by Maiden Mills
- Polygenta perpetual
- Poole Company EcoSure® and Bioplast™
- RadiciGroup r-RADYARN®
- RadiciGroup r-Starlight®
- Sinterama Newlife™
- Teijin ECOPET and ECOPET PLUS
- Thread International Ground to Good™
- Toray ECOUSE™ and CYCLEAD™
- Unifi REPREVE ®

*Bio Polyester*

Visit <u>Biosynthetics</u> to learn more.

Bio Polyester is made from renewable sources such as bio waste or crops instead of PET or other petroleum sources. Biosynthetics are often considered a more sustainable option than virgin polyester, but it can get complicated. Sustainability issues with biopolymers can arise:

- If the raw material used is not farmed in a sustainable manner. (For example, if it is made out of sugarcane, the environmental impact of growing that sugarcane). Biosynthetics can be more chemically intensive and polluting based on the fertilizers and pesticides used to grow crops and the processing needed to turn them into plastic.
- If the raw material is a GM (genetically modified) crop.
- If the biosynthetic material is not properly disposed of. Biosynthetics incorrectly disposed of in landfills or recycling facilities can cause environmental harm.

## How It's Made

There are many types of polyesters. Specific processes used by manufacturers vary and are proprietary, but the general steps of production include:

1. Petroleum forms in nature over the course of millions of years.
2. Petroleum is extracted from the earth with giant drilling machines and treated.
3. Petroleum is transported to refineries (by truck, ship, tanker, or pipeline) where heat, fuel, electricity, high pressure, solvents, and catalysts are used to break down the molecules into useful ingredients. This process is also referred to as "cracking". Many petrochemical products can be derived from petroleum at refineries, but ethylene and p-xylene are the monomers used for the polyester production. Ethylene is then broken down even more using heating, cooling, pressure, water, and sometimes a catalyst to produce raw materials useful for polyester production, in particular ethylene glycol. The two main acids used in the production of polyester are dimethyl terephthalate (DMT) and terephthalic acid (TPA), organic compounds produced from P-xylene. Both DMT and TPA are stored in molten form and transported in tanks from refineries.
4. PET (polyethylene terephthalate, the same type of plastic used in plastic soda bottles) is formed through a process of polymerization in which ethylene glycol, TPA, and (depending on the process) DMT are combined using heat and high pressure. The result is a liquid of honey-like consistency that is extruded, dried, and chopped up to make plastic pellets.
5. To make polyester fibers, PET plastic pellets are melted and extruded through tiny holes called spinnerets to form long threads, which are then cooled to harden into a fiber. This process is called melt spinning. The shape and qualtity of holes can be altered to create fibers with different qualities. These fibers are twisted together to create polyester yarn and wound onto bobbins, where they are ready to be woven into fabric.

## Available Standards & Certifications

The Global Recycled Standard (GRS) | The Global Recycled Standard is a holistic certification for products with recycled content. The desired effect of the GRS is to provide brands with a tool for more accurate labeling, to encourage innovation in

the use of reclaimed materials, to establish more transparency in the supply chain, and to provide better information to consumers. The Global Recycled Standard (GRS) is an international, voluntary, full product standard that sets requirements for third-party certification of Recycled Content, chain of custody, social and environmental practices, and chemical restrictions. The goal of the GRS is to increase use of Recycled materials in products and reduce/eliminate the harm caused by its production. It is intended for use with any product that contains at least 20% Recycled Material. Each stage of production is required to be certified, beginning at the recycling stage and ending at the last seller in the final business-to-business transaction.  You can see the full standard here.

Recycled Claim Standard (RCS) | The Textile Exchange RCS was originally developed in partnership with Outdoor Industry Association's Sustainability Working Group's Materials Traceability Task Force in 2013. It is an international, voluntary standard that sets requirements for third-party certification of Recycled input and chain of custody. The goal of the RCS is to increase the use of Recycled materials. You can see the full standard here.

OEKO-TEX® STANDARD 100 | A worldwide consistent, independent testing and certification system for raw, semi-finished, and finished textile products at all processing levels, as well as accessory materials used. The tests for harmful substances cover:

- legally banned and controlled substances
- chemicals known to be harmful to the health (but not yet legally controlled)
- parameters for health protection

Taken in their entirety, the requirements go far beyond existing national legislation.

Suggested Reading

You can read more about the Microplastics issue here.

"Fiber Briefing: Polyester" From Common Objective

"Petrocultures: Oil, Politics, Culture" By Sheena Wilson, Adam Carlson, Imre Szeman

"To polyester or not to polyester" From O Ecotextiles

## Reports & Studies

"Plastics, the environment and human health", Thompson, et al, Philosophical Transactions of the Royal Society, Biological Sciences, July 27, 2009

Atkisson, Alan, "Food, Fuel and Fiber? The Challenge of Using the Earth to Grow Energy", December 2008

Carmichael, Alasdair "Man made Fibers Continue to Grow", Textile World

Gustav Sandina and Greg M. Peters, Journal of Cleaner Production 184 (2018) 353-365

## Examples

Patagonia | Patagonia began making recycled polyester from plastic soda bottles in 1993 – the first outdoor clothing manufacturer to transform trash into fleece. This video will walk you through the process.

Parley for the Oceans | Parley for the oceans created Ocean Plastic®, a range of premium materials for the sports, fashion and luxury industries made from intercepted and upcycled marine plastic debris. Ocean Plastic® replaces virgin materials. They also create informative and beautiful video content, which can be found on their youtube channel.

Amur | Amur uses recycled polyester to create high end eveningwear.

## Bibliography

- *Fashion Fibers: Designing for Sustainability* by Annie Gullingsrud.

- *Textile*s textbook *by* Sara Kadolph
- The Textile Exchange Preferred Fiber Materials Market Report
- MADE-BY Environmental Benchmark for Fibres
- Common Objective (CO) Resources directory
- Manufacturing Polyester
- *Sustainable Fashion and Textiles: Design Journeys* by Kate Fletcher
- "What is the difference between crude oil, petroleum products, and petroleum?" from the US Energy Information Administration

# PREVIOUS



Fiber Guide: Hemp

→

# NEXT



Fiber Guide: Rayon

→

# SUBSCRIBE

KEEP UP-TO-DATE WITH ALL THE LATEST NEWS FROM THE COUNCIL OF FASHION DESIGNERS OF AMERICA.

EMAIL ADDRESS                                        SUBMIT

PROGRAMS                                          RESOURCES

Professionals                                        Production Directory

Students

Supply Chain

Materials Hub

Sustainability Resource Hub

## SUPPORT

Partnerships

## ABOUT

About

Philanthropy

Social Impact

Statements & Reports

## EVENTS

CFDA Fashion Awards

New York Fashion Week

## NEWS & INSIGHTS

All Articles

Industry Insights

## MEMBERS

Member Directory

Become a Member

## GET IN TOUCH

Contact

Newsletter

## FOLLOW US

Facebook

Instagram

YouTube

X

## SITE

Accessibility

Cookie Policy

Privacy Policy

Terms and Conditions

COPYRIGHT © 2026 THE COUNCIL OF FASHION DESIGNERS OF AMERICA, INC.



